SO ORDERED: August 30, 2012.



_____
**James K. Coachys
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROBERT WYNNE TENNANT, D.C., | ) | Case No. 11-07599-JKC-11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| ROBERT WYNNE TENNANT, D.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 12-50004 |
| | ) | |
| FIFTH THIRD BANK and | ) | |
| JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter comes before the Court on Plaintiff/Debtor Robert Wynne Tennant, D.C.,'s ("Tennant") Complaint against Defendants Fifth Third Bank ("Fifth Third") and JPMorgan Chase Bank, N.A. ("Chase"). Following a trial on June 6, 2012, the Court took the matter under

advisement and instructed the parties to file briefs on their respective positions and to submit proposed Findings of Fact and Conclusions of Law. Having reviewed the evidence and testimony presented at trial and the parties' respective submissions, the Court hereby issues the following Findings of Fact and Conclusions of Law.

## **Findings of Fact**

1.  On June 15, 2011 (the "Petition Date"), Tennant commenced a voluntary case under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case").

2.  Tennant is the fee owner of residential real property commonly known as 2816 W. Buckeye Drive, Greenfield, Hancock County, Indiana 45140 and more particularly described as:

    LOT 21 IN AMENDED FINAL PLAT OF SUGAR CREEK VALLEY ESTATES, PHASE I, AN ADDITION IN HANCOCK COUNTY, INDIANA, AS PER PLAT THEREOF RECORDED MARCH 12, 1992 AS INSTRUMENT NO. 92-2072 IN THE OFFICE OF THE RECORDER OF HANCOCK COUNTY, INDIANA.

(the "Property").

3.  As of the Petition Date, Tennant owned the Property jointly with his non-bankruptcy spouse, Jama S. Tennant, as tenants by the entireties. Per Schedule C of his bankruptcy petition, Tennant claimed the Property as exempt under the tenancy by the entireties exemption provided by Indiana Code § 34-55-10-2(c)(1).

4.  On November 10, 1997, Tennant executed and delivered to Banc One an Adjustable Rate Note and Adjustable Rate Rider in the amount of $254,400.00. On that same date, Tennant executed and delivered to Banc One a Mortgage on the Property that was recorded on December 1, 1997, in the Office of the Hancock Country Recorder.[1]

---

[1] All of the mortgages and mortgage-related documents at issue in this case were properly recorded in the Office of the Hancock County Recorder. Because the date of such recordings and their instrument

2

5. On December 9, 1999, Tennant executed and delivered to People's Trust Co ("PTC") a Mortgage on the Residence that was recorded on December 16, 1999.

6. On March 26, 2002, Tennant executed and delivered to PTC a new Note, the proceeds of which were used to payoff the 1999 PTC Note and Mortgage.

7. On March 26, 2002, Tennant executed and delivered to PTC a new Mortgage that was recorded on April 18, 2002.

8. On April 12, 2002, PTC executed a Satisfaction of Mortgage in favor of Plaintiff that was recorded on April 24, 2002.

9. On October 31, 2002, Tennant executed and delivered to Fifth Third an Equity Flexline Credit Agreement (the "HELOC" or "HELOC Agreement") in the amount of $100,000.00.

10. On October 31, 2002, Tennant and his wife executed and delivered to Fifth Third an Open-End Mortgage on the Property that was recorded on December 2, 2002 (the "Fifth Third Mortgage").

11. In September of 2004, MainSource Bank acquired–by merger between PTC and Union Bank and Trust Co. of Indiana–Tennant's 2002 Note and Mortgage in favor of PTC. Hereinafter, the 2002 Note and Mortgage shall be referred to as the "MainSource Loan"

12. On or about July 19, 2005, Tennant submitted a Uniform Residential Loan Application to Argent Mortgage Co. ("Argent") that disclosed a balance on the HELOC Agreement.

13. On July 27, 2005, Tennant executed and delivered to Argent an Adjustable Rate Note and Adjustable Rate Rider in the amount of $468,000.00.

---

numbers are not in dispute, the Court has not included them in its Findings of Fact.

14. To secure the above indebtedness, on July 27, 2005, Tennant executed and delivered to Argent a Mortgage on the Property that was recorded on August 9, 2005. Hereinafter, the Argent Note and Mortgage shall be referred to as the "Argent Loan."

15. On July 28, 2005, Tennant executed a HUD-1 Settlement Statement for the Argent refinancing of the Property, with Title Pro LLC as the settlement agent.

16. As of July 28, 2005, the date the HUD-1 Settlement Statement was executed, the payoff on the MainSource Loan was $238,401.60.

17. As of July 28, 2005, the date the HUD-1 Settlement Statement was executed, the payoff on the 2002 Note and Mortgage with Fifth Third was $101,599.05.

18. On August 8, 2005, Fifth Third received a payment in the amount of $101,599.05 from the closing on the Argent Loan. Such payment reduced the HELOC balance to -$130.14.

19. Fifth Third did not release its Mortgage at the time of this payoff, and the HELOC remained in place.

20. The MainSource Loan was also paid off in full with the proceeds form the Argent Loan.

21. On September 20, 2005, less than sixty days following the Argent Loan closing, Tennant requested an advance under the HELOC in the amount of $5,000.00.

22. Between July 28, 2005, and November 14, 2006, Tennant requested advances from Fifth Third under the HELOC in an amount totaling $83,700.00.

23. On November 3, 2006, Tennant executed and delivered to Countrywide Bank ("Countrywide") a Uniform Residential Loan Application to obtain a $480,000.00 loan from Countrywide. On November 14, 2006, Tennant executed and delivered to Countrywide a Uniform

4

Residential Loan Application to obtain a $60,000.00 loan from Countrywide. Both Applications disclosed a balance on the HELOC.

24. On November 15, 2006, Tennant executed and delivered to Countrywide an Adjustable Rate Note, Adjustable Rate Rider, and Prepayment Penalty Addendum in the amount of $480,000.00.

25. On November 15, 2006, Tennant executed and delivered to Countrywide a Note with Balloon Payment and Prepayment Penalty Rider in the amount of $60,000.00.

26. To secure the above indebtedness, on November 15, 2006, Tennant executed and delivered to Countrywide two Mortgages on the Property. Hereinafter, the Countrywide Notes and Mortgages shall be referred to as the "Countrywide Loans."

27. On November 15, 2006, Tennant executed HUD-1 Settlement Statements for the Countrywide Loans, with Title Pro LLC as the settlement agent.

28. The proceeds from the Countrywide Loans were used to fully satisfy the Argent Loan. Fifth Third did not receive a payment from the Countrywide Loans despite a balance on the HELOC at that time in the amount of at least $78,312.87 and Tennant's disclosure of the HELOC on the Uniform Residential Loan Applications for the Countrywide Loans.

29. Between November 15, 2006, and July 16, 2006, Tennant requested and obtained advances from Fifth Third under the HELOC in an amount totaling $25,000.00.

30. Following the November 15, 2006 closing on the Countrywide Loans, Tennant never instructed Fifth Third to close the HELOC or to release its Mortgage, and Fifth Third did not otherwise release its Mortgage.

31. On May 14, 2007, Tennant submitted a Uniform Residential Loan Application to First

Magnus Financial Corp. ("First Magnus") to obtain a $607,500.00 loan. The Application disclosed a balance on the HELOC.

32. On July 17, 2007, Tennant executed and delivered to First Magnus an Adjustable Rate Note, Adjustable Rate Rider, and Prepayment Penalty Addendum in the amount of $607,500.00.

33. On July 17, 2007, Tennant executed and delivered to MERS, as nominee for First Magnus, a Mortgage on the Property in the amount of $607,500.00 that was recorded on July 25, 2007. Hereinafter, the First Magnus Note and Mortgage shall be referred to as the "First Magnus Loan."

34. On July 17, 2007, Tennant executed a HUD-1 Settlement Statement for the First Magnus Loan, with Pinnacle Land Title Co. as the settlement agent.

35. As of July 17, 2007–the date the HUD-1 Settlement Statement was executed–the payoffs on the Countrywide Loan were $510,675.00 and $61,334.29.

36. Fifth Third did not receive a payment from the First Magnus Loan despite a balance on the HELOC at that time in the amount of at least $80,533.76, and Tennant's disclosure of a balance on the HELOC on the Uniform Residential Loan Application for the First Magnus Loan.

37. On November 19, 2007, Tennant requested a check in the amount of $89,333.52 drawn on his account at MainSource Bank payable to Fifth Third. Such payment resulted in a zero balance on the HELOC.

38. Between July 18, 2007 and the Petition Date, Tennant requested and obtained advances from Fifth Third on the HELOC in an amount totaling $111,000.00.

39. On August 21, 2007, First Magnus filed a Chapter 11 bankruptcy petition, and the First Magnus Loan was eventually acquired by Washington Mutual Bank.

40. On September 26, 2009, Washington Mutual Bank filed a Chapter 11 bankruptcy petition, and the First Magnus Loan was eventually acquired by Chase.

41. MERS, as First Magnus's nominee, assigned the Mortgage to Chase on July 27, 2011.

42. Debtor obtained an appraisal on May 11, 2011, that valued the Property at $297,500.00.

43. Following the filing of the Bankruptcy Case, Fifth Third moved for relief from the automatic stay so that it could foreclose its alleged mortgage on the Property. Tennant objected to such relief, primarily arguing that Fifth Third's mortgage contained a defective property description.

44. Also in the Bankruptcy Case, Tennant moved to avoid Fifth Third's alleged mortgage interest in the Property, arguing that the mortgage contained a defective property description. Fifth Third objected to such relief and insisted that its mortgage is, contrary to Debtor's assertion, valid.

45. On January 5, 2012, Tennant initiated this adversary proceeding by way of a Complaint against Chase and Fifth Third. Per the Complaint, Tennant seeks a determination of the relative priorities of Chase's and Fifth Third's alleged mortgages liens on the Property. Neither Chase nor Fifth Third asserted any cross claims or counterclaims in response to the Complaint.

46. According to Schedule D of Tennant's bankruptcy petition, the current balance owed to Fifth Third under the HELOC is 94,566.00.

47. According to Schedule D of Tennant's bankruptcy petition, the current balance owed to Chase under the First Magnus Loan is $713,754.00.

48. An April 9, 2012 Lien and Judgment Search, performed by Investors TitleCorp at Tennant's request, reveals that Fifth Third's mortgage is superior to Chase's mortgage.

**Conclusions of Law**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K).

2. In his Complaint, Tennant asks the Court to establish the priority of Chase's and Fifth Third's respective mortgages. More specifically, Tennant raised two issues in his Complaint: the validity of the assignment between MERS and First Magnus and the legal description for the Property set forth in Fifth Third's mortgage. Inexplicably, neither of these issues was discussed at trial. Rather, two other issues were raised at trial:[2] First, whether Fifth Third has a valid mortgage lien against the Property under its loan documents; and, second, whether the doctrine of equitable subrogation renders Chase's mortgage lien superior to Fifth Third's mortgage lien.

3. Admittedly, the Court is bothered by the fact that two issues not otherwise formally pled by the parties were ultimately tried. None of the parties complained of this and the issues were arguably tried by consent. Still, it was far from the ideal way to present the issues to the Court for resolution.

4. The Court further notes that the dispute at hand is largely between Chase and Fifth Third (although certainly Debtor has some stake in the outcome as it bears on plan confirmation), with Chase arguing that Fifth Third's position is inferior to its own, notwithstanding what the most

---

[2] The Court notes that at the hearing on Debtor's lien avoidance motion and Fifth Third's relief from stay motion on January 4, 2012, counsel for Tennant, Chase and Fifth Third hinted at the issues that were ultimately tried in this adversary proceeding. However, no one specifically referenced "equitable subrogation." Counsel for Tennant did suggest that Chase's title insurer might have a role to play in the proceeding given concerns over whether the insurer neglected to identify Fifth Third's lien, but Chase apparently chose not to name the insurer as a third-party defendant. Counsel for Chase also suggested that there was some issue as to whether Fifth Third was obligated to release its lien. None of these issues were discussed at any length. Rather, counsel for Tennant indicated that he intended to file this adversary proceeding to present the lien priority dispute for resolution. Clearly, the Complaint did not identify all of the issues that were ultimately tried, nor did Chase's or Fifth Third's responsive pleadings.

recent title search otherwise reveals.  Chase, however, did not formally assert cross-claims against Fifth Third.  Fifth Third did not argue this point at trial, and so the Court raises it here only to further underscore the awkwardness of this proceeding.

5. Finally, the Court notes that Tennant–in his post-trial brief takes a somewhat contradictory position from what he argued at trial with respect to whether Fifth Third's claim should be treated as secured.  On one hand, he argues in his brief that Fifth Third was contractually obligated to release its mortgage upon the loan being fully repaid in August of 2005 with the Argent Loan proceeds, but then argues that because he continued to draw on the HELOC, Fifth Third should enjoy the benefits of what amounts to some form of an equitable lien.  However, Fifth Third, itself, has not asserted an equitable lien, and the Court declines Tennant's invitation to address that issue.

6. With those remarks, the Court turns its attention to the substantive issues that were presented at trial.

7. At trial, the parties largely focused on whether Chase was entitled to priority over Fifth Third pursuant to the doctrine of equitable subrogation.  As explained below, the Court finds that issue to be overshadowed by the other issue raised at trial, i.e., whether Fifth Third has a valid mortgage lien against the Property in the first place.

8. The facts before the Court show that the HELOC was fully satisfied on August 8, 2005, by the Argent Loan proceeds.  Paragraph 24 of the Fifth Third Mortgage states that "[u]pon payment of all Indebtedness, Obligations and Future Advances secured by this Mortgage, Lender shall discharge this Mortgage with any costs paid by Borrower"

9. Paragraph 22 of the Fifth Third Mortgage also provides that "[u]pon request by Borrower, Lender, at Lender's option, may make Future Advances to Borrower.  Such future and

9

additional loan advances, with interest thereon, shall be secured by this Mortgage when evidenced by promissory notes stating that such notes are secured hereby.  At no time, shall the principal amount of the Indebtedness secured by this Mortgage, not including sums advanced in accordance herewith to protect the security of this Mortgage, exceed the original amount of the Indebtedness plus $0."

10. Tennant and Chase both argued at trial that Fifth Third was obligated to release its mortgage when the loan balance was fully satisfied by the Argent Loan proceeds on or about August 8, 2005.  Fifth Third insists, however, that it was not required to release its mortgage absent explicit instructions from Tennant to do so, instructions that Fifth Third apparently did not receive.  The Court disagrees with Fifth Third.

11. Indiana Code § 32-28-1-1(b) states:

> When the debt or obligation and the interest on the debt or obligation that the mortgage, mechanic's lien, judgment, or other lien secures has been fully paid, lawfully tendered, and discharged, the owner, holder, or custodian shall: (1) release; (2) discharge; and (3) satisfy of record; the mortgage mechanic's lien, judgment or other lien.

The question before the Court is whether this statutory provision was triggered by operation of the HELOC Agreement and Fifth Third Mortgage.

12. Under Indiana common law, it is a court's duty to interpret a contract so as to ascertain the intent of the parties.  *Bank of America, N.A., v. Ping*, 879 N.E.2d 665, 669 (Ind.Ct.App.2008) (*citing First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 603-04 (Ind.1990)).  In interpreting a written contract, the court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties.  *Id*. at 669-70.  Where the terms of a contract are clear and unambiguous, the terms are

10

conclusive, and the Court will not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions.  The terms of a contract are not ambiguous merely because the parties disagree as to the proper interpretation of the terms.  *Ogle v. Ogle*, 769 N.E.2d 644, 647 (Ind.Ct.App.2002), *trans. denied* (citations omitted).

13. There is nothing in the Fifth Third Mortgage or HELOC Agreement that puts a burden on Tennant to explicitly request that Fifth Third close the HELOC and release its Mortgage.  Rather, Paragraph 24 of the mortgage unambiguously states that "Lender shall discharge" the mortgage upon full payment of the indebtedness due under the HELOC Agreement.  Given this language, Fifth Third was clearly required to discharge its mortgage on or about August 8, 2005, upon full satisfaction of the then outstanding loan balance.

14. Indiana case law supports that conclusion.  In *U.S. Bank N.A. v. Seeley*, 953 N.E.2d 486 (Ind.Ct.App.2011), the Indiana Court of Appeals concluded that Bank of America–upon receiving a payment that fully satisfied an outstanding balance on a home equity line of credit–was required to release its mortgage absent language in the underlying note and mortgage requiring the mortgagor to take affirmative action to close the credit line.  *Id.* at 490.  In so holding, the court distinguished two other Indiana Court of Appeals cases, the aforementioned *Ping*, 879 N.E.2d at 665, and *Dreibelbiss Title Co. v. Fifth Third Bank*, 806 N.E.2d 345 (Ind.Ct.App.2004).  Both *Ping* and *Dreibelbiss* involved lines of credit that explicitly required the mortgagor to affirmatively terminate the credit agreement before the mortgagee was required to release its mortgage.  *Seeley*, 953 N.E.2d at 490.

15. Admittedly, the courts in both *Seeley* and *Ping* emphasize that "[u]nlike a term note, a revolving line of credit is not automatically terminated when the balance is paid down to zero,

11

because, as we have noted, "'that would violate the very nature of the credit.'" *See Seeley*, 953 N.E.2d at 489 (*quoting Ping*, 879 N.E.2d at 670)). But in this Court's view, the loan documents for a revolving line of credit must be drafted in such a way as to effectuate this critical difference.[3] Here, there is no language in either Fifth Third's credit agreement or mortgage that required Tennant to take affirmative action to close the account. Rather, paragraph 24 clearly and unambiguously states that Fifth Third was to discharge its mortgage upon satisfaction of any indebtedness due. Pursuant to that language and to Indiana Code § 32-28-1-1(b), the Court concludes that Chase is entitled to a release of Fifth Third's mortgage.

16.     Even if Fifth Third was not required to discharge its mortgage upon full payment of the loan balance in August of 2005, the fact remains that Fifth Third also did not comply with the Mortgage's "dragnet" clause. Pursuant to Paragraph 22 of the Fifth Third Mortgage, quoted above, in order for Future Advances[4] to be secured by the Fifth Third Mortgage, new promissory notes were to be executed. Tennant testified at trial that he did not sign any additional notes with Fifth Third,

---

[3] This conclusion is consistent with the result in *Seeley*. In its opinion, the Indiana Court of Appeals did point to extrinsic evidence regarding communications between the title company and Bank of America that indicated the mortgagor's intention to "pay off" the line of credit, but it does not appear that such evidence was necessary to the court's holding. *See Seeley* at 489-90. Rather, the court emphasized that the mortgage has to be released because the loan documents did not require the mortgagor to take affirmative action to close the account. *Id.*

Here, there is no evidence before the Court as to whether Title Pro LLC, the settlement agent for the Argent, specifically instructed Fifth Third to close the account and/or release its mortgage. While such evidence would have been instructive, perhaps, its absence does not dictate a different result. The unambiguous language used by the parties in the HELOC Agreement and Fifth Third Mortgage is controlling.

[4] The term "future advances" is not defined in the HELOC Agreement and Fifth Third Mortgage, and the documents do not expressly speak to the difference between an advance and a future advance. The Court presumes that a future advance is one made after the loan balance has been reduced to zero. Otherwise, each and every advance under the loan would have to be made pursuant to a new note in order to be secured.

and Fifth Third offered no evidence to suggest a different explanation as to how the parties intended Paragraph 22 to operate. The Court cannot conclude, then, that the indebtedness incurred by Tennant pursuant to the HELOC after August 8, 2005, is secured by the Fifth Third Mortgage.

17. Based on the foregoing, the Court orders Fifth Third's mortgage on the Property released. In the absence of a valid mortgage, Fifth Third does not hold a secured claim against the bankruptcy estate for the balance now due under the HELOC Agreement. Tennant's indebtedness to Fifth Third–which Tennant himself does not dispute–shall be treated as unsecured. It would appear, then, that Chase has a first priority position on the Property. However, the Court notes that the April 2012 title search reveals that MainSource Bank has third- and fourth-position mortgage liens–pursuant to open-ended lines of credit– against the Property. The Argent Loan proceeds were used to pay balances under those lines of credit, but it would appear that such liens may not have been released. Tennant did not list these loans in his schedules, and while the Court would like to assume that there is no balance due under the loans, it is reluctant to do that. Chase may need to take further action against MainSource to secure firmly its position as the first priority mortgagee.

18. Based on the foregoing conclusions, the Court need not discuss or determine whether Chase is entitled to equitable subrogation–the other issue presented at trial.

19. The Court will issue a Judgment consistent with these Findings of Fact and Conclusions of Law contemporaneously herewith.

###

Distribution:

Harley K. Means
James G. Lauck
David J. Jurkiewicz
Weston E. Overturf
Tammy L. Ortman
Steven K. Dick
UST
Chapter 13 Trustee

14